IN THE COURT OF CRIMINAL APPEALS
OF TEXAS



NO. AP-76,263




EX PARTE BRIAN EDWARD DAVIS, Applicant




ON APPLICATION FOR A WRIT OF HABEAS CORPUS
IN CAUSE NO. 616522 IN THE 230TH DISTRICT COURT
HARRIS COUNTY




           Keller, P.J., filed a dissenting opinion in which Meyers, Keasler, and
Hervey, JJ., joined.

           
           The instructions that were given to the jury failed to provide a fully adequate vehicle for
considering much of applicant’s proffered mitigating evidence in violation of Penry I.


 Although
the jury charge included a supplemental instruction designed to meet Penry I’s dictates, the
instruction was inadequate under Penry II.


 After finding error, the Court remands for a new trial,
without considering the issues of preservation and harm. Because applicant failed to object, the
record must show egregious harm before he is entitled to relief. And because the record does not
show that applicant was egregiously harmed by the Penry I error, relief should be denied.
A. The Appropriate Standard of Harm
            When a federal constitutional error has been preserved, or did not need to be preserved, the
appropriate standard of harm (at least on direct appeal) is a federal question, controlled ultimately
by decisions of the United States Supreme Court.


 But when a party fails to comply with a state’s
rules for preserving a complaint, the federal standard does not control; the party must rely upon the
state’s rules regarding unpreserved error.


 Under Texas criminal law, when no objection is made to
an error in the jury instructions, the applicable standard of harm is the “egregious harm” standard
articulated in Almanza:


 that the defendant “has not had a fair and impartial trial.”


 This “egregious
harm” standard applies even when the unpreserved error involves a violation of the federal
constitution.


 The standard is the same on direct appeal and habeas corpus.


 
            With respect to Penry claims, we have exempted from preservation requirements those
individuals who were tried before Penry I was handed down.


 Because the law prior to Penry I was
so firmly settled against any additional mitigating evidence instructions, we held that we were
unwilling to fault the defendant or his attorney for failing to lodge an objection.


 Although an
egregious harm standard would “normally” apply to unobjected-to jury charge error, we
“interpret[ed] the Supreme Court cases related to this particular issue to have broader due process
implications.”


 We emphasized, however, that our preservaton holding turned on “the unique
circumstances of [the] case, and the state of the law at the time of [the defendant’s] trial.”


 
             In Ex parte Smith (on remand from Smith I),


 we addressed a situation in which the
defendant’s trial occurred after Penry I was handed down.


 Explaining that the “egregious harm”
standard in Almanza was the “usual method” for evaluating unpreserved jury instruction claims, we
held that unpreserved Penry error would be analyzed accordingly.


 Although the defendant objected
that the Texas statutory death-penalty scheme was invalid after Penry I, because it did not provide
to the jury an adequate vehicle for considering mitigating evidence, we held that he failed to preserve
error because he did not object to the nullification instruction that was submitted.


 
            In Smith II,


 the Supreme Court reversed, holding that this Court misconstrued the nature
of the error at issue.


 The Supreme Court found that we were under the “mistaken belief that Penry
II . . . rested on a separate error arising from the nullification charge.”


 But, “it was the special
issues, not the nullification charge, that created the error.”


 Because Smith had objected to the
special issues, he had preserved error.


 It appeared to the Supreme Court, then, that the proper
standard of harm under Texas law was the “some harm” standard articulated by Almanza for errors
that were preserved.



            Applicant was tried in 1992, which was after Penry I was handed down. The parties and the
trial court were well aware of Penry I at the time of trial, as evidenced by the parties’ voir dire, the
parties’ closing arguments, and the supplemental jury charge.


 Moreover, the Legislature had
already enacted §2(e) of Article 37.071, requiring the submission of a mitigation special issue,
though, at the time, the change in the law applied only to offenses committed on or after September
1, 1991.


 So the law was no longer firmly established against giving an instruction designed to
allow the jury to give effect to mitigating evidence. Rather, Supreme Court caselaw required such
an instruction and, in fact, the Legislature had passed a statute requiring the submission of a
mitigation special issue, though that statute did not apply in applicant’s case.


 
            And unlike the defendant in Smith, the applicant here failed to raise any objection at trial that
relates to the Supreme Court’s Penry jurisprudence.


 Therefore, even under Smith II, applicant
failed to preserve error, and the “egregious harm” standard from Almanza applies to this case. 
                            B. Whether the Requisite Level of Harm Has Been Shown
            “Egregious harm” is a difficult standard to meet.


 The error must have “created such harm
that [the defendant] was denied a fair trial.”


 In determining whether the defendant suffered
egregious harm, the reviewing court should examine “the entire jury charge, the state of the evidence,
including the contested issues and weight of the probative evidence, the arguments of counsel, and
any other relevant information revealed by the record of the trial as a whole.”


 The defendant must
have suffered “actual, rather than theoretical, harm,” and the harm suffered must be of the sort that
“affect[s] the very basis of the case, deprive[s] the defendant of a valuable right, or vitally affect[s]
a defensive theory.”


 
            The jury was given the following supplemental instruction:
You are instructed that when you deliberate on the questions posed in the special
issues, you are to consider all relevant mitigating circumstances, if any, supported by
the evidence presented in both phases of the trial, whether presented by the State or
the defendant. A mitigating circumstance may include, but is not limited to, any
aspect of the defendant’s character, background, record, emotional stability,
intelligence or circumstances of the crime which you believe could make a death
sentence inappropriate in this case. If you find that there are any mitigating
circumstances in this case, you must decide how much weight they deserve and
thereafter, give effect and consideration to them in assessing the defendant’s personal
culpability at the time you answer the special issue. If you determine, when giving
effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative
finding to the issue under consideration, rather than a death sentence, is an
appropriate response to the personal culpability of the defendant, a negative finding
should be given to that special issue under consideration.
 
            This was an ambiguous instruction, like the one given in Penry II, that, on its face, could be
interpreted either as telling the jury (1) to take “mitigating evidence into account in determining their
truthful answers to each special issue,” or (2) to “simply answer one of the special issues ‘no’ if it
believed that mitigating circumstances made a life sentence appropriate regardless of its initial
answers to the questions.”


 The former interpretation added nothing to the special issues,


 while
the latter interpretation – as a “nullification” instruction – placed jurors in an ethical dilemma that
created a reasonable likelihood that the jury was prevented from considering the defendant’s
proffered mitigating evidence in an appropriate manner.


 A clear nullification instruction, such as
the one given in Smith I, would be subject only to the second criticism.



            Because the instruction in the present case was ambiguous, a harm analysis must consider
the likelihood that the jury understood that it had the power to “nullify” the special issues based on
mitigating evidence (that is, give a negative answer to at least one of the special issues on the basis
of mitigating evidence that was not encompassed by any of the special issues). As I will explain
more fully below, the jury was informed of its power to nullify in both voir dire and closing
arguments. In Penry II, the Supreme Court suggested that discussions during voir dire and closing
arguments might be used to clarify that an ambiguous instruction was in fact a nullification
instruction.


 In that case, the judge, the prosecutor, and defense counsel explained the instruction
in nullification terms during voir dire, and defense counsel gave a similar explanation during closing
argument.


 
            But the Court expressed three concerns about whether the jurors in Penry II really understood
that a nullification instruction was being submitted. First, because voir dire began almost two full
months before penalty phase deliberations, and the jurors were subjected to five-day trials on both
guilt and punishment, plus attendant instructions, the Court was skeptical about whether the jurors
would remember the voir dire explanations.


 Second, the Court suggested that defense counsel’s
arguments might not be an adequate substitute for statements of law by the trial court.


 Finally, the
Supreme Court found that the prosecutor effectively neutralized the defense counsel’s argument by
stressing the jurors’ duty to follow their oaths, the evidence, and the law – resulting in the jury
receiving, at best, “mixed signals.”


 I address these concerns in light of the egregious harm standard
and the record before us. 
            The Supreme Court’s skepticism about whether the jurors remembered the explanations from
voir dire may be appropriate in determining whether error took place, but such skepticism is not
enough to establish egregious harm. The possibility of fading memories may support a rule in favor
of giving jurors unambiguous instructions immediately before or during deliberations, and error may
result from the failure to do so. But the possibility that the jurors’ memories would fade constitutes
theoretical, rather than actual, harm, and does not establish egregious harm under Almanza. 
            The record in this case reveals that the nullification concept was discussed extensively during
jury selection, and that discussion, in some respects, compares favorably to the Supreme Court’s
recitation of facts in Penry II. All of the jurors in the present case were informed during voir dire
that, even if the State proved that the answers to the two submitted special issues should be “yes,”
the jury could still answer one or both of those special issues “no” based upon mitigating evidence. 
Most of the jurors were informed of this by at least two of the trial participants, usually the
prosecutor and defense counsel.


 With a majority of the jurors, the prosecutor characterized this
situation as a “safety valve” to ensure that the death penalty was not assessed against someone who
should not receive it.


 Most of the jurors were explicitly asked if they understood the nullification
concept, and all of those answered affirmatively.


 The remaining jurors were asked if they could
give effect to the concept and answered affirmatively. Most of the jurors were asked if they could
apply this concept in an appropriate case, and all of those jurors answered affirmatively.


 The voir
dire accomplished more than simply giving jurors abstract information about the use of mitigating
circumstances in a nullification process. The jurors were asked to respond to that information by
indicating that they understood how the process worked, or that they could follow the process in an
appropriate case, or both. 
            In an egregious harm analysis, we should look at counsel’s arguments in light of the voir dire. 
The jurors had already been told during voir dire that the law conferred upon them the power and
the duty to nullify the special issues based upon mitigating evidence in an appropriate case. The
attorneys’ arguments at the close of the punishment phase were a reminder of the law that had
already been explained to them. 
            And unlike the situation in Penry II, defense counsel was not forced to unilaterally argue the
nullification concept, with the prosecutor undercutting those arguments before the jury. Rather, the
parties exhibited a shared understanding of the concept. One of the defense attorneys told the jury
that there were three issues to resolve at the punishment stage of trial: the deliberateness issue, the
future dangerousness issue, and the question of mitigation. The defense attorney defined mitigation
as “those factors in [applicant’s] life and [applicant’s] background that would cause you to believe
that, even if the State has approached (sic) beyond a reasonable doubt that the proper answer to issue
number one is yes and number two is yes, that a life sentence is appropriate.” 
            The prosecutors’ arguments were consistent with defense counsel’s understanding. In closing
argument, one of the prosecutors outlined the two special issues and then said, “Of course, you will
have to take into consideration the mitigation issue, if any, but it’s in here that those are the two
issues and when you answer those two issues you’ve done your job.” Later, the prosecutor
explained, “The Court’s charge informs you that you are to consider all relevant and mitigating
circumstances. If you find there is a mitigation in this case. First, find it is true mitigation in a case. 
If there is any, how much weight does that mitigation deserve and then you determine if a life
sentence is an appropriate response to the personal culpability of the defendant.” In arguing for the
death penalty, the prosecutor later stated, “I submit to you, ladies and gentlemen, that if you find
there are mitigating factors in this case, that they don’t come up near to excusing this or to offsetting
what he’s done and what he’s capable of.”



            The other prosecutor attacked applicant’s proof of mitigating circumstances, but not the
legitimacy of offering such evidence as an independent reason to reject the death penalty:
“Mitigation in a capital murder case. Mitigation first of all means you have to believe it’s true. . .
. You heard about dyslexia and epilepsy and hyperactivity. Those are [defense counsel’s] questions
and insinuations and hopes. You didn’t have one witness or one doctor come in here and tell you
that [applicant] has any of those conditions. Why not? Because he doesn’t. He’s perfectly normal. 
His only problem is that he’s mean.” Later, the prosecutor expounded: “Mitigating evidence. True
mitigating evidence is something that would cause you to think a death penalty is not appropriate. 
Evidence such as the defendant being sexually abused as a child for years and years. . . . Mitigating
evidence is somebody who really is retarded.” The prosecutor later continued: “There is no
mitigating evidence in this case. And if you find that all of those things [alleged by applicant] even
added up, if you believed they were mitigating evidence, they still don’t rise to the level where a
death sentence is not appropriate in this case.”



            The upshot of this discussion is that there is plenty of reason to think that the jury did
understand that it had the power to “nullify” the special issues on the basis of mitigating evidence. 
If the jury understood that it had the power to “nullify,” then the jury had a vehicle, however
imperfect, through which it could give full effect to all mitigating evidence. Under those
circumstances, a defendant who failed to object can hardly be in a position to claim that his trial was
unfair. If he had wanted the jury to receive a more perfect vehicle for considering his mitigating
evidence, he should have done something to alert the trial court to the problem.


 By failing to
object, the defense attorney signaled his own belief in the fairness of the proceedings. If applicant
thinks his attorney should have acted differently, he has a better remedy than claiming that he was
egregiously harmed: an ineffective assistance of counsel claim, where the attorney can explain
whether he had a trial strategy and what it was, and if deficient performance is found, an evaluation
can be conducted under the less onerous standard of prejudice articulated in Strickland v.
Washington.


  
            I respectfully dissent.
Filed: November 18, 2009
Do Not Publish